## A. J. SMITH v. JOHN E. FISHER.

Middle Section. October 14, 1929.

Petition for Certiorari denied both parties by Supreme Court, April 5, 1930.

McGugin & Evans, of Nashville, for plaintiff in error.
J. B. Daniel, of Nashville, for defendant in error.

FAW, P. J.   A. J. Smith (hereinafter called defendant) has appealed in error to this court from a judgment of the Circuit Court of

Davidson County in favor of John E. Fisher (hereinafter called plaintiff) for $835 and costs.

On May 4, 1928, defendant's Ford truck, loaded with lumber, collided with plaintiff's automobile, known as a Dodge Senior Six Sedan, and on May 26, 1928, plaintiff instituted this action to recover $1250 as damages which he alleged had resulted to him by reason of the injuries thus inflicted upon his automobile.

The case was tried to a jury at the November, 1928, term of the Circuit Court, and the jury found the issues in favor of the plaintiff and assessed the damages to the automobile at $735 and plaintiff's loss of the use of his car at $100, making a total of $835, and judgment was entered in favor of plaintiff and against defendant for $835 and the costs of the cause.

After his motion for a new trial had been overruled, the defendant, as before stated, appealed in error to this court, and he has tendered a number of assignments of error, which will be considered in the order that seems most convenient to us, without attempting to follow the order in which they are assigned.

Plaintiff's declaration contains three counts. Averments common to all the counts are that the defendant, A. J. Smith, is and prior to May 4, 1928, was engaged in the lumber business in Nashville, Tennessee, and in conducting said lumber business used motor trucks in handling and delivering lumber and the products of lumber to various places in the City of Nashville; that defendant does not personally handle the trucks, but they are actually operated and handled by negro drivers, as agents, servants and representatives of the defendant, and for whose negligent conduct in doing so, the defendant is liable and responsible; that in operating these heavy lumber trucks upon the public streets and highways of the City of Nashville the defendant and his agents, servants and employees were required to be watchful and vigilant and to have and keep the trucks under control so that the same would not run into other vehicles rightfully upon the highway; that on May 4, 1928, plaintiff was the owner of a new Dodge Senior Six Sedan automobile, in perfect condition and worth $1750, which was in daily use by plaintiff and his family; that plaintiff used it in going to and from his office and in transporting his daughters to and from school as well as for shopping and pleasure.

In the first count it is averred that on the aforesaid date of May 4, 1928, plaintiff's said automobile was rightfully parked at the curb on Twenty-Third Avenue North, near Church Street, in the City of Nashville, and was in reverse gear with the brakes set on same; that while thus situated, about three o'clock in the afternoon of the day named, one of the defendant's trucks loaded with lumber in charge of one of the defendant's negro agents, servants and employees, was,

with gross carelessness, wantonly and recklessly run backwards into and against plaintiff's aforesaid valuable automobile, in plain view, with much force and violence, knocking said automobile a considerable distance, whereby and by reason whereof said automobile was mashed, torn, broken up and practically destroyed; that plaintiff has also been deprived of the use of his car; that all of the aforesaid occurred without fault on the part of plaintiff, but resulted directly and proximately from the gross negligence, wantonness and recklessness on the part of the defendant's negro agent, servant and employee as aforesaid.

It is averred in the second count that defendant was charged with the duty of having his trucks in reasonably safe condition for hauling loads of lumber on the highways of the city and this involved the duty of proper examination and inspection; that defendant breached his duty in these respects, and failed to make the proper inspection, and failed to have the truck hereinafter referred to in a reasonably safe condition for use upon the highways of the city, in that, the brakes and machinery by which the movements of the truck should have been controlled were defective and insufficient.

In the third count it is averred that on May 4, 1928, while plaintiff's automobile was parked at the curb on Twenty-Third Avenue North, near Church Street, one of defendant's motor trucks which defendant had negligently permitted to be in a dangerous and unsafe condition and which was overloaded with lumber and in charge of a negro driver, was entering Vanderbilt campus at the Twenty-Third Avenue entrance to Vanderbilt University, and while pulling a slight grade in said campus, by reason of the defective, dangerous and unsafe condition of the truck, and the same being overloaded with lumber, some part of said truck failed or refused to properly function, or gave way, and said truck began going backwards, and by reason of the defective condition of the brakes on said truck, which would not hold, and by reason of the excessive load thereon, the truck continued to go backwards down said slight grade and out of the campus of Vanderbilt University, and by reason of the gross negligence of defendant's negro agent and servant in charge of the said truck, instead of stopping on West End Avenue, was allowed to go backwards and across West End Avenue and down Twenty-Third Avenue for almost a city block, when said truck was negligently permitted to back upon and into plaintiff's new automobile, striking same with great force and violence and knocking it about fifteen feet, crushing and mashing the whole rear part of the body and demolishing same and doing great damage and injury to the machinery of said automobile, ruining and demolishing same, to such an extent as to damage same, and greatly depreciate its value, and also depriving plaintiff of the use of his car; that all of the aforesaid resulted directly and proximately from the gross negligence of the defendant in having in

use on said occasion a car that was defective, out of fix and dangerous, and in negligently overloading said car, and in the operation and manipulation of said car with gross negligence by the agents, servants and employees of the defendant as aforesaid.

In his charge to the jury, the learned trial judge defined the issues as follows:

"The plaintiff has sued the defendant in this case for $1250 damages, and the declaration containing three counts, among other things, substantially alleges in the first count that one of the defendant's trucks loaded with lumber and in charge of defendant's servant was carelessly and negligently run backwards into and against plaintiff's automobile, in plain view, with much force and violence, greatly injuring said automobile. That this was without fault on the part of the plaintiff and resulted directly from the gross negligence of the defendant's employee.

"In the second count of the declaration it is charged that the above injury to plaintiff's automobile occurred on account of the failure of the defendant to keep his truck in a reasonably safe condition and on account of his failure to make proper examination and inspection to ascertain whether or not the brakes and machinery by which the movements of the said truck were controlled were defective and insufficient.

"In the third count of the declaration it is alleged that the accident occurred by reason of the defendant's negligence in permitting his said truck to be in a dangerous and unsafe condition and by reason of its being overloaded with lumber, and that while pulling a slight grade on account of the defective condition of said truck some part of same gave way causing it to run backwards and on account of the defective condition of the brakes they would not hold the excessive load which had been placed upon the truck, and that instead of stopping it the truck was negligently allowed to run backwards across West End Avenue and down 23rd Avenue where it was negligently permitted to back into plaintiff's new automobile with great force and violence, greatly injuring the same by impairing its value and depriving the plaintiff of its use.

"The plea is not guilty. The legal effect of this plea is to deny every material statement in the declaration and to cast the burden of proof upon the plaintiff who must prove the case substantially as stated in at least one count of the declaration by a preponderance of all the evidence in the case before a recovery can be had."

In that part of the charge above quoted, we think the trial judge fairly and accurately interpreted the plaintiff's declaration. It is seen from a comparison of the first count of the declaration with

the court's charge, supra, that the court omitted the averment of "wantonness and recklessness" on the part of the driver of defendant's truck. This was proper, for there was no evidence which reasonably tended to show that defendant's driver wantonly or recklessly ran 'the defendant's 'truck into plaintiff's car, and the court did not submit to the jury the matter of punitive or exemplary damages. On behalf of the defendant, it is insisted that the declaration avers "negligence generally" in the first count, a failure to inspect the truck and keep it in safe condition in the second count, and defective brakes and overloading of the car in the third count; and, thus construing the declaration, defendant seeks to invoke the rule that where a plaintiff pleads "negligence generally," and then alleges certain specific acts of negligence as the cause of his injuries, he must recover, if at all, upon the negligence specifically pleaded. Upon this theory, defendant's counsel, when the case was taken up for trial, moved the court to "strike" the first count of the declaration, but the court overruled the motion, and his action in that respect, coupled with the court's interpretation of the first count, as stated in the charge before quoted, is made the basis of defendant's second assignment of error in this court.

We do not think there was error in the action of the trial court thus complained of. It is true that the entire declaration presents a single cause of action; that is to say, this is not a case where distinct causes of action are joined in one suit, but in different counts (as in Bible v. Palmer, 95 Tenn., 393, 32 S. W., 249), or a case where damages to the person and damages to the property, resulting from a single tort, are joined in one action, but in different counts (as in Railroad v. Matthews, 115 Tenn., 172, 91 S. W., 194), but it is a case where the plaintiff has alleged, in each of three separate counts, a different act of negligence as the cause of the same injury. Macklin v. Dunn, 130 Tenn. 342, 351, 170 S. W., 588.

The law requires the driver of a motor vehicle to exercise ordinary or reasonable care to avoid injury to the persons or property of others lawfully using the highway, and we think the first count of the declaration contains an averment of the failure of defendant's driver to discharge the duty which defendant thus owed to the plaintiff sufficient to constitute a charge of actionable negligence, without reference to the remaining counts of the declaration. The defendant's second assignment of error is therefore overruled.

Recurring to the first assignment of error: It is as follows: "There is no evidence to support the verdict of the jury, and therefore the court erred in overruling defendant's motion for a directed verdict made at the conclusion of the plaintiff's evidence and renewed at the conclusion of all the evidence."

Insofar as the first assignment relates to the overrulement of the motion for a directed verdict made at the close of the plaintiff's evi-

dence, it must be overruled, for the reason that plaintiff did not elect to stand upon his motion for a directed verdict then made, but, after the motion was overruled, defendant proceeded to put on witnesses in his own behalf and thereby waived the motion made at that time. Life & Casualty Insurance Co. v. Robertson, 6 Tenn. App. R., 43, 56, and cases there cited. See also Poling v. Ohio River Railroad Co., 38 W. Va., 645, 24 L. R. A., 215, 224.

The motion for peremptory instructions made at the close of all the evidence was based upon the proposition that there was no evidence in the record upon which a verdict against the defendant could be sustained.

The entire record in the case has been fully considered by the court, but it is unnecessary to extend this opinion by including a detailed review of the evidence, as an assignment that the trial court erred in overruling a motion for a directed verdict presents a question of law, and the ruling of this court thereon may be reviewed by the Supreme Court on the record. The requirements of the Act of 1925, chapter 100, with reference to findings of fact, apply to chancery cases only, and have no application to the instant case. However, before disposing of the first assignment, a brief statement of certain salient facts disclosed by the record will be made.

It may be well to say that there is no issue of contributory negligence in this case. Plaintiff's car was properly parked at the curb on the east side of Twenty-Third Avenue North, headed north, when it was struck in the rear by defendant's truck, which was running backward.

It also appears, and is admitted, that defendant was the owner of the truck in question; that the driver of the truck was the servant of the defendant and was driving the truck within the scope of his employment and in the usual course of the defendant's business at the time of the accident. The question for decision under the first assignment is, whether there is any evidence that the defendant (either in person or through his servant, the driver) was guilty of any of the negligent acts or omissions charged in the declaration.

"There can be no constitutional exercise of the power to direct a verdict in any case where there is a dispute as to any material evidence, or any legal doubt as to the conclusion to be drawn from the whole evidence upon the issues to be tried, but the case must go to the jury." Hines v. Partridge, 144 Tenn., 219, 232, 231 S. W., 16.

Defendant operates a lumber mill in the City of Nashville, and the truck in question was hauling a load of finished lumber from defendant's mill to Vanderbilt University. As the truck was ascending a grade from the south side of West End Avenue, across the side-

walk, and into the Vanderbilt campus, the universal joint broke and the truck began to roll backward, whereupon the driver, finding it impossible to go forward, applied the brake with all the force at his command, and the brake-band broke, leaving the driver powerless to check the backward movement of the truck.

Twenty-Third Avenue North terminates at West End Avenue, and the gateway at which the truck was entering Vanderbilt campus is directly opposite the mouth of Twenty-third Avenue North. The grade of Twenty-Third Avenue descends from West End Avenue to Church Street—a distance of one block. There was much traffic on West End Avenue and Twenty-Third Avenue—street cars and automobiles on West End Avenue and automobiles on Twenty-Third Avenue—and, according to the testimony of the driver of defendant's truck (Wiseman), the problem which confronted him when he found himself powerless to propel the truck forward or check its backward movement, was, how to avoid a collision with passing vehicles. He steered the truck, as it moved backward, across West End Avenue and along Twenty-Third Avenue to Church Street and turned it toward the west on Church Street, where it came to a stop near the southwest corner of Twenty-Third Avenue and Church Street.

From the Vanderbilt campus to Church Street the truck pursued a very crooked and "zigzag" course, which, the driver states, was caused by his efforts to avoid striking passing automobiles, and, in one of these "zigzag" movements, it veered far enough toward the east side of Twenty-Third Avenue to strike the rear of plaintiff's car, which, as before stated, was parked at the curb.

With reference to the first count of the declaration, the question to be decided just now is, whether it can properly be held, as a matter of law, that defendant's driver, Wiseman, acted, in the circumstances under investigation, as an ordinarily prudent person would have acted under the same circumstances?

> "Ordinary care is that degree of care which a person of reasonable prudence would exercise under a given state of facts appearing in the evidence in a cause, or in a state of facts similar thereto. This ordinary care may be positive or negative; that is, it may consist of what a person of reasonable prudence would have done under the same or similar circumstances, or of refraining from doing what he would have refrained from doing under these circumstances. What a person of reasonable prudence would have done under the same or similar circumstances must be determined by the jury from their knowledge of mankind, and of how persons of reasonable prudence usually deport themselves in relation to their surroundings." Railroad v. Wade, 127 Tenn., 154, 158, 153 S. W., 1120.

On behalf of defendant, it is insisted that defendant's driver was suddenly and unexpectedly placed in a perilous situation, and if he

acted according to his best judgment in the emergency thus arising, he is not chargeable with negligence, even though he might have pursued a wiser and more judicious course, and one which would not have resulted in injury to plaintiff's car.

The principle which defendant thus seeks to invoke is well established. See Cullom v. Glasgow, 3 Tenn. App. R., 443, and authorities there cited; Power Packing Co. v. Borum, 8 Tenn. App. R., 162, 169, and authorities there cited.

But "whether under circumstances of emergency the conduct of the operator of the vehicle measures up to the standard of reasonable care, is generally a question for the jury." Huddy on Automobiles (7 Ed.), sections 347 and 442. See also authorities cited, supra.

Moreover, it is equally well settled, as will be seen from the authorities above cited, that the "emergency doctrine" must be taken with the qualification that "one cannot shield himself behind an emergency created by his own negligence." And so, in the instant case, if the emergency which confronted defendant's driver was produced by negligence of the defendant or his servants, such, for example, as overloading the truck as charged in the third count of the declaration, the defendant cannot successfully invoke the emergency rule.

Aside from a statement of the driver (Wiseman) to plaintiff, made about thirty minutes after the collision (which statement was admitted without objection), that "his truck was in bad shape," we have not found any evidence in the record upon which, in our opinion, the jury could have based a verdict for plaintiff under the second count of the declaration. The mere fact that the universal joint broke and the brake-band "snapped" is not, of itself, evidence of a negligent failure to inspect the truck.

Huddy on Automobiles (7 Ed.), sec. 419; 42 C. J., p. 897.

The rule of res ipsa loquitur does not apply to the facts of this case. The undisputed proof tends to show that the truck in question was inspected for defendant, at reasonable intervals, by an automobile mechanic.

Moreover, the proof is that any inspection of the truck that could have been made (without tearing it down) would not have revealed a defect in the universal joint, and that there was no visible or discoverable defect in the brake-band. But the statement of the driver that "his truck was in bad shape," is some evidence that the truck was defective, and that this was known to the driver, whose knowledge on this subject was, under the circumstances, imputable to the defendant.

There was, we think, sufficient evidence to take the case to the jury for a finding under the third count of the declaration. The truck in question was a one-ton Ford truck, with an Olsen extension—the Olsen extension being intended to lengthen the truck so as to enable

it to carry long lumber with a proper adjustment of the weight between the front and rear wheels.

This truck was manufactured, and sold by the manufacturer, as a "one-ton truck," which means that it was designed and built primarily to carry a maximum load of one ton, or two thousand pounds. The evidence tends to show that at the time of the accident defendant's truck was carrying a load of lumber weighing three thousand pounds, which had been placed on it by defendant's employees, and had been seen by defendant in person before it left his mill.

There is undisputed evidence that this was not an unusual load to be carried by the truck in question and other one-ton Ford trucks of the same kind operating on the streets of Nashville. But the customary way of doing a thing may be a negligent way, and evidence that it was customary for one-ton Ford trucks to carry a load of three thousand pounds (and sometimes four thousand pounds) on the streets of Nashville, although admissible, was not conclusive. Babbitt on Motor Vehicles (3 Ed.), sec. 2158.

We think that intelligent minds might draw different conclusions from the evidence as to whether an ordinarily prudent person would have placed a load of three thousand pounds on the truck in question, and this was, therefore, a matter for the jury to determine. Roofing & Manufacturing Co. v. Black, 129 Tenn., 30, 36, 164 S. W., 1183.

It was also for the jury, if they found that the truck was "overloaded," to say whether, from this fact, in the light of all the evidence, it could be reasonably inferred that the excessive load on the truck was the proximate cause of the breaking of the universal joint and the brake-band. 22 R. C. L., p. 148. The defendant's first assignment of error is overruled.

The defendant's third assignment is as follows:

"The court erred in overruling the defendant's motion to limit the scope and purpose of the evidence of the plaintiff and witness Hines as to the alleged conversation with and statements made by the driver, Wiseman, following the accident, to the effect that the truck was overloaded, and the brakes gave way, and in not instructing the jury, as requested, that this evidence was not binding or competent to establish liability against the defendant, and therefore in overruling the second ground of the motion for a new trial."

We are of the opinion that there was no reversible error in the matters to which this assignment is directed. The plaintiff related the statements of the driver, Wiseman, upon the invitation and with the consent of the defendant, through his counsel, and the statements of the driver made to the witness Hines contained nothing prejudicial to defendant and were also admitted without objection. There was no motion at any time to exclude this testimony. There was a motion

to limit its effect, to which motion more specific reference will be made later.

The testimony of the plaintiff with respect to the statements of the driver, and the manner in which this testimony came into the record, may be seen from an excerpt from Judge Fisher's testimony in the record, as follows:

"A. I can give you about what the driver said.

"Q. Is that right? A. Do you want me to tell you what the driver said?

"Q. You can tell it if you want to? A. The driver said his truck was in bad shape and as he was pulling up the incline into Vanderbilt campus with this heavy load of lumber on it, it gave way, the brakes wouldn't hold and it ran back and he came on across West End Avenue and down Twenty-Third Avenue trying to avoid hitting some of these cars, and that he had too heavy a load of lumber on it. I asked him why he didn't stop up on West End Avenue and turn east or west on West End Avenue, and he said he didn't think about it.

"Q. Do you see anything in all that? A. And that he came on down running backwards all the way down Twenty-Third Avenue until he hit this car."

And that part of the testimony of General Hines to which the third assignment refers is as follows:

"Q. What did he say about that truck running into the car? A. He said that his truck did it, he didn't make any questions about that, but he couldn't help it, he said the truck got away from him as he got in the Vanderbilt gate, something broke about it and he tried to explain it to me, but I am not much of a mechanic, it seems like something gave way on the truck that he couldn't apply the brakes, or the force of the engine could stop it, so there was nothing for him to do but to go back down the hill and pray to the Lord to get out the best way he could."

The driver, Wiseman, was later examined as a witness for defendant, and in his testimony he made the same statements, in substance, as those attributed to him by General Hines. It is obvious, therefore, that the testimony of General Hines above quoted worked no harm to the defendant, and it may be excluded from further consideration here.

But Judge Fisher states in his testimony above quoted that the driver said (among other things) that "his truck was in bad shape," and that "he had too heavy a load of lumber on it."

This testimony concerning the statements of the driver, made about thirty minutes after the accident, was not a part of the res gestae, but was hearsay, and wholly inadmissible for any purpose, if proper objection had been offered. Tennessee Central Railway Co. v. Gleaves, 2 Tenn. App. R., 549.

It might have been competent, after Wiseman had testified, to prove statements made by him out of court which were inconsistent with his testimony—a proper predicate being laid for such contradiction by asking Wiseman if he had made such statements at a time and place fixed and to a person or persons named; for the sole purpose of impeaching his truthfulness (Middle Tenn. Railroad v. McMillan, 134 Tenn., 490, 515, 184 S. W., 20; Richmond v. Richmond, 10 Yerg., 342, 346); but at the time Judge Fisher delivered the testimony challenged by the third assignment, Wiseman had not testified, and this testimony was not legally competent, over objection, for any purpose.

But the admission of the testimony of Judge Fisher was invited by the defendant, through his counsel, and a party cannot successfully assign as error the admission of evidence which he has invited. 2 R. C. L., pp. 238-239.

We have heretofore stated that there was a motion to limit the effect of the testimony of plaintiff and Hines concerning the statements made to them by the driver. This was after the plaintiff had closed his evidence in chief and defendant had moved for a directed verdict in his favor. In response to defendant's motion for peremptory instructions, the court said:

"What the driver said was not objected to, on the other hand, Mr. Evans, you brought it out. The plaintiff said, I can tell you what the driver said, and you said, go ahead, and when Mr. Hines came on he told it and you didn't object to that, and I suppose the reason you didn't object to that was because you had asked for it when the plaintiff was on the stand."

Immediately upon the conclusion of the court's statement just quoted, defendant's counsel said: "I want now to make the objection to the conversation of the driver on the grounds that it was admissible for the purpose of showing what he did at the time, but not as substantive evidence of negligence."

To which the court responded as follows: "Whatever evidence is admitted at all it is admitted for all purposes unless it is modified by the court and explained to the jury for the reason evidence is admitted."

Thereupon counsel for defendant stated the character and scope of the limitation which he was seeking to have the court place upon the testimony in question, as follows:

"I expected in my requests, if Your Honor didn't do it, to ask that that be limited to what I have stated. This evidence was competent to go to the jury to show the actions of the servant at that time, but not competent to establish a substantive act of negligence on the part of the defendant. In other words, here is the point, if Your Honor please—If that darkey's statement and his conduct had showed that he right there at the time had

been guilty of some negligence, it would have been competent for that purpose, and that is the reason when he started to tell it, I couldn't object, but when he comes out and says the brakes has given away on the thing, his brakes gave away and he was overloaded, because the brakes gave away, that is not necessarily negligence at all, but if he said he wasn't watching what he was doing and lost control of the car that would have been evidence of negligence on the part of the defendant, and that is the reason I couldn't object at the time, but for the purpose of the motion, I am making the objection that the admission of the statement of this darkey, both as testified to by Mr. Fisher, and that testified to by General Hines, be limited by a proper instruction, and with that application I want it treated as made along with my motion for a directed verdict. Right on that point, Mr. Fisher's evidence came as a surprise to me, because I was under the impression from another witness that he had made a different statement, and his evidence would have been competent. Mr. Fisher's and Mr. Hines' evidence as to what this darkey said would have been competent tending to show what the darkey did while the accident was going on.''

Evidence of statements made by defendant's driver after the accident, purporting to relate what he did at the time of the accident and in connection therewith, was not legally competent for the purpose to which defendant's counsel sought to have it limited, viz.: to show negligence of the driver in the operation of the truck ''while the accident was going on.''. Street Railroad Co. v. Howard, 102 Tenn., 474, 478, 52 S. W., 864.

But, the defendant having consented, without limitation or reservation, that the plaintiff state what the driver had told him about the accident, the testimony, although hearsay, was substantive evidence for the consideration of the jury. Ehrlich v. Weber, 114 Tenn., 711, 718, 88 S. W., 188.

A party may not be permitted to experiment with a witness by eliciting testimony, and then, if the testimony is unsatisfactory to him, have it excluded, or limited in scope. The third assignment of error is overruled.

The sixth assignment is that the court erred in admitting evidence that lumber and casings were so piled on the truck as to obstruct the view of the driver backward through the window or glass in the cab.

The court did not charge the jury that piling the lumber and casings on the truck so as to obstruct the driver's view as above stated would constitute an act of negligence on which a verdict against defendant could be based, but merely held that such testimony was ''competent as bearing upon the main allegation in the first count that the car (truck) was negligently run backwards into the plaintiff's car.''

We think it was competent for the parties to show all the conditions which may have affected the ability of the driver to direct the movement of the truck as it ran backward across West End Avenue and along Twenty-Third Avenue, and the evidence challenged by the sixth assignment was therefore competent for the reason stated by the trial court, supra, and that assignment is overruled.

Under sub-heads (designated respectively as a to g, inclusive) in the eighth assignment, the defendant assigns error upon seven separate excerpts from the charge of the court to the jury. For reasons familiar to the courts and the bar, it is often difficult to interpret a sentence or a paragraph of a charge, and properly appraise its probable effect upon the jury, without reading it in connection with the remainder of the charge. We will, therefore, quote all that part of the charge beginning with the first excerpt on which error is assigned, and continuing, without omission, to the conclusion of the charge, indicating the particular instructions of which complaint is made by italicizing.

To the extent and in the manner just stated, we quote the charge of the court, as follows:

"*There are several modes of impeaching a witness. One is by rigid cross-examination of the witness regarding material matters involved in the lawsuit about which he testifies.* Immaterial discrepancies in the testimony of a witness do not necessarily affect his credibility unless there is something to show that they originate in wilful falsity. The jury cannot, and must not arbitrarily disregard the testimony of any witness unless it should plainly appear that he or she has wilfully sworn to a falsehood regarding some material matter involved in the case. When it appears that a witness has thus falsely testified, then you would be justified in disregarding his evidence entirely except such portions as may be corroborated by other reliable and credible proof.

"The proximate cause of an injury, is that act of (or) omission preceding the accident which causes or fails to prevent the injury. In other words, it is the act or omission occurring or concurring with another which had it not happened the injury would not have been inflicted.

"It is the duty of the court to instruct the jury (as) to the law of this case, and it is your duty to weigh the evidence and to find the facts. It is for you to judge of the credibility of the witnesses and to reconcile all conflicts and discrepancies, if any, in their testimony upon the supposition that all of them have spoken the truth, if you can do so, but if you cannot do this, then it is your duty to believe that evidence which you think more worthy of credit and to ignore such evidence as you cannot believe.

"This case is based on the alleged negligence of the defendant. Negligence as applied to the defendant in a case like this means the failure to exercise ordinary care, that is, such care as ordinarily prudent persons would exercise under circumstances similar to those shown by the evidence in this case.

"*When a material fact has been proven the jury has the right to draw all reasonable inferences or conclusions from the proven facts,* but you would not be warranted in basing an inference upon another inference.

"The court charges you, gentlemen of the jury, that it was the defendant's duty in operating his truck upon the streets to exercise ordinary care as hereinabove defined, and to have said truck in a reasonably safe condition for the service required of it, and this includes inspections of the brakes and other part of the truck at reasonable intervals, to ascertain whether or not repairs should be made and to make such repairs as may be reasonably necessary from time to time so as to put said truck in a reasonably safe condition for the service required of it.

"*It was further the defendant's duty to exercise reasonable care in the selection of a driver for said truck* and that said driver, so selected, should exercise reasonable care, as hereinabove defined, to see to it that said truck should not be overloaded, or that it was not loaded beyond the capacity of the brakes or other parts of the machinery so as to be likely to cause accidents of the kind complained of.

"*It was further the defendant's duty to put said truck in charge of a reasonably prudent and competent driver, and it was the said driver's duty upon discovering that the brakes would not hold and that the truck was beginning to run backwards to exercise reasonable or ordinary care to stop it, or to cut it into the curb, or in some other way to prevent the increase of the truck's speed running down hill backwards so as to prevent a collision with some other vehicle on the street* if he could do so by the exercise of ordinary care and caution. Therefore, gentlemen, if you shall find from a preponderance of all the evidence in this case that the defendant or his truck driver negligently failed to exercise the ordinary or reasonable care required of them, as aforesaid, in *any* of the *above respects,* and if you shall further find that such failure was the direct or proximate cause of the injury to the plaintiff's automobile, then the defendant would be liable in this case and your verdict should be in favor of the plaintiff.

"But if you shall find that an ordinarily careful driver, situated as the defendant's truck driver was at the time said truck was running backwards and out of control, would or *reasonably* might have failed to adopt the *safest* method to *prevent* the

accident, then the defendant would not be liable if the defendant's truck driver failed to adopt the *safest* method to have prevented the accident, that is, defendant would not be liable on that ground.

"Again, gentlemen, if you shall find that the defendant failed to have said truck properly inspected, still if you shall find that a proper inspection would not have revealed the defects, if any, that caused this accident, no recovery could be based upon the ground of a failure to inspect said truck.

"Again, gentlemen, if you shall find that the plaintiff has failed to make out his case substantially as stated in at least one count of the declaration, by a preponderance of all the evidence in the case, or if you shall find that this accident could not have been avoided by the exercise of ordinary care, then the defendant would not be liable and your verdict should be in favor of the defendant.

"If you shall find in defendant's favor your verdict should be 'we find for the defendant,' but if you shall find for the plaintiff you should go further and assess the damages. In assessing damages in a case like this you should ascertain from a preponderance of all the evidence the cash market value of the plaintiff's automobile immediately before the accident, and deduct therefrom the cash market value of said automobile immediately after the accident as shown by a preponderance of all the evidence and this difference *together with the damages for the loss of the use of plaintiff's automobile during the time reasonably required to make the repairs, plus the decreased value of plaintiff's automobile after said repairs were made, if any, as shown by a preponderance of all the evidence, such sum* should be the amount of your verdict.

"As above stated, you should ascertain the market value of plaintiff's automobile both immediately before and immediately after the accident, but in your effort to arrive at such market values *you may take into consideration the original cost of plaintiff's automobile when new, the amount of use it had been* put to, together with the estimated cost of making the necessary repairs, and *also what the injured automobile sold for after the accident without any repairs being made.* All of these things may be looked to by the jury as circumstances so far as they may tend to show the real market value of the plaintiff's automobile before and after the accident.

"A. G. RUTHERFORD, Judge.

"Gentlemen of the jury, counsel for the defendant requests the court to charge you in addition to the main charge as follows:

" 'You are further instructed that if you find for plaintiff and therefore find it necessary to consider plaintiff's damages,

290

you should look to and consider along with other evidence the evidence of the depreciation in the cash market value of the car before the accident from its new sale price after such use as plaintiff's car had been subjected to.'

"You can take·the case, gentlemen, and when you reach your verdict just come in."

It is said, for defendant, that the first italicized instruction in the above-quoted charge is erroneous because a "rigid cross-examination" does not impeach a witness unless it involves him in contradiction, and that, on this subject, the court should have said: "One (mode of impeaching a witness) is by rigid cross-examination of the witness to involve him in contradiction regarding material matters involved in the lawsuit about which he testifies;" and, in support of this assignment, counsel cite Richmond v. Richmond, 10 Yerg., 342, where the court said: "A witness may be impeached by proving that he is not worthy of credit, or that the facts to which he deposes are not true, or by cross-examination in which he may be involved in inconsistencies."

The particular statement of the court thus criticised is correct as far as it goes, and we think it is made plain by the remainder of the paragraph that the purpose of a "rigid cross-examination," when employed as a mode of impeaching a witness, is intended to involve the witness in inconsistencies. The sentence immediately following the criticized statement is that, "immaterial discrepancies in the testimony of a witness do not necessarily affect his credibility unless there is something to show that they originate in wilful falsity." Webster's New International Dictionary, in the course of the definition of the word "inconsistent," says "Inconsistent implies contradiction or discrepancy." When used in connection with the subject which is now under discussion, "inconsistency" and "discrepancy" are practically synonymous. We do not think there is any sufficient reason to suppose that the jury might have been misled by the court's charge into the belief that the mere fact that the defendant's witness Wiseman (the driver) was subjected to an extremely "rigid cross-examination" was of itself an impeachment of the witness (as suggested in defendant's brief). Subdivision (a) of the eighth assignment is overruled.

It is next said that the court erred in charging the jury that, "when a material fact has been proven the jury has the right to draw all reasonable inferences or conclusions from the proven facts."

Standing alone, this is merely a statement of one of the chief functions of a jury, but it is only a part of a sentence in the charge, the remainder of which is in these words: "but you would not be warranted in basing an inference upon another inference." Doubtless the leading thought which the learned trial judge had in mind, and intended to convey to the jury, was that contained in the clause last

quoted, which was an eminently proper cautionary instruction, more likely, if observed by the jury, to be beneficial to the defendant than to the plaintiff. Subdivision (b) of the eighth assignment is overruled.

As appears from the charge above quoted, the court instructed the jury that, "it was further the defendant's duty to exercise reasonable care in the selection of a driver for said truck" etc., and, in the next succeeding paragraph, instructed the jury that, "it was further the defendant's duty to put said truck in charge of a reasonably prudent and competent driver" etc. Then, after enumerating certain other duties of the defendant, the court said: "Therefore, gentlemen, if you shall find from a preponderance of all the evidence in this case that the defendant or his truck driver negligently failed to exercise the ordinary or reasonable care required of them, as aforesaid, in any of the above respects, and if you shall further find that such failure was the direct or proximate cause of the injury to the plaintiff's automobile, then the defendant would be liable in this case and your verdict should be in favor of the plaintiff."

Under the law, it was the defendant's duty to exercise reasonable care in the selection of a driver for his truck, and to put his truck in charge of a reasonably prudent and competent driver (Huddy on Automobiles (7 Ed.), sec. 355; 42 C. J., pp. 1077, 1078, 1079); but the declaration did not give the defendant any notice that the plaintiff would seek to hold the defendant liable upon such grounds, and it was, therefore, error to charge the jury that they could base a verdict in favor of the plaintiff upon a finding that the defendant had been negligent in the matter of the selection of a driver. East Tennessee Coal Co. v. Daniel, 100 Tenn., 65, 73, 42 S. W., 1062; Memphis Street Railway Co. v. Cavell, 135 Tenn., 462, 467, 187 S. W., 179; Moore & McFerren v. Fletcher, 145 Tenn., 97, 102, 236 S. W., 924; Grace v. Curley, 3 Tenn. App. R., 1, 7; N., C. & St. L. Railway v. Whitt, 5 Tenn. App. R., 463, 468; Harrell v. Railroad, 5 Tenn. App. R., 471, 479; Elkin Motor Co. v. Ragland, 6 Tenn. App. R., 166, 172, and other cases there cited.

No witnesses testified, one way or the other, as to whether Wiseman was "a reasonably prudent and competent driver," but it was disclosed by Wiseman's testimony that he is a negro man, forty-one years of age; that he had been employed continuously by defendant for about five years and four months; that during the first two years and four months of this period he had "worked in the yard," and during the remaining three years he had been driving a truck; that he had had no previous experience as a truck driver; that he was taken from the "yard" and taught by Jake Thomas, a cousin of defendant, how to drive a truck; that it took him "about two days" to learn how to drive a truck, and that since that time

he had been driving the truck involved in this case, which was a "brand new truck" when he begun to drive it.

Wiseman was subjected to a lengthy and skillful cross-examination, the obvious purpose of which was to elicit evidence tending to show that he had not handled the truck in a skillful manner on the occasion in question.

Without intending to be understood as holding that the proof shows that Wiseman was an unskillful and incompetent driver, we think it reasonably possible that the jury may have drawn such an inference from the evidence. If they did so find, and further found that this was the proximate cause of the injury to plaintiff's automobile, they were authorized by the court's charge to find a verdict in favor of the plaintiff. Upon what particular negligence of defendant the jury based their verdict is not disclosed by the record; hence, we cannot say that the error above indicated was harmless.

It is seen that the court also charged the jury that "it was the said driver's duty upon discovering that the brakes would not hold and that the truck was beginning to run backwards to exercise reasonable or ordinary care to stop it, or to cut it into the curb or in some other way to prevent the increase of the truck's speed running down hill backwards so as to prevent a collision with some other vehicle on the street if he could do so by the exercise of ordinary care and caution."

We think it was error to tell the jury that it was the duty of the driver to "cut it (the truck) into the curb." Such statement would naturally convey to the jury the suggestion that the court thought the truck could have been stopped, without injury to the persons or property of others, by cutting it into the curb, or, at least, a suggestion that there was evidence to that effect. The evidence bearing on that subject is found in certain excerpts from the testimony of Wiseman, the driver, as follows:

"Q. Why didn't you cut it so it would stand one way or the other? A. A car was coming and traffic was pretty heavy and I tried to dodge that, I didn't want to hurt anybody and I was trying to get back. I was going down grade and I tried to guide it to keep from running into anybody.

"Q. Did you guide it into Mr. Fisher's car or did it get beyond your control? A. Before I got to his car there was another car coming behind me, like anybody would have been, they not knowing but what I could stop, and I had to dodge him you see.

"Q. People were in that car were they? A. Yes, sir.

"Q. Could you have made it go anywhere you wanted it to or you just had to do the best you could with it? A. I had to do the best I could. . . .

"Q. If your window hadn't been obscured at all with frames there, you could have looked back and seen the whole street at one time, couldn't you? A. 1 seen the whole street, there was cars coming up on this side and there was cars parked over here, and a car was coming up right on the side of me, and ordinarily they pull to the right, and I had to dodge them too, you see.

"Q. Didn't you, as you went down that street there backwards, didn't you make a trail by your wheels that was as as crooked as a drunken snake? A. That load you see, going backwards—

"Q. Answer the question? A. Yes, sir, I was trying to guide it.

"Q. You were all over the street and it made a crooked path like a snake? A. I was dodging them cars.

"Q. Answer the question whether you did that or not? A. Yes, sir, I did that.

"Q. Finally you ran into this car?

BY MR. EVANS:

You can make any explanation you want to as to why you did it. Make your explanation now, you said you did it. A. I done that in order to dodge these other cars that were coming up. I saw people in them.

BY MR. DANIEL:

"Q. How many cars were dodging you? A. There wasn't any, they didn't have any right to dodge me, they were on the right side and I was going backwards. . . .

"Q. How did you finally stop your truck? A. It stopped itself.

"Q. It stopped itself in spite of you?
                    Objected to and sustained.

"Q. Were you making any effort to stop it? A. I was guiding it the best I could.

"Q. You were guiding it like you guided it into Mr. Fisher's car? A. I didn't guide it into his car, I tried to miss his car. . . .

"Q. You did turn it then when you got to Church street? A. There wasn't any traffic, I saw a car coming up here and that is the reason I dodged it. All I did was trying to dodge it, I tried to dodge that car and came here and struck this one and rolled on down.

"Q. While you are there, can you draw a line and show the waves in it like it went down? A. I don't know how much waves I made. That is the last car I passed, I know that, because the truck hit the car and rolled on down.

"Q. You don't know what you were doing up here? A. I was watching the traffic and trying to guide it too. . . .

"Q. Why didn't you turn down Broad street or West End when you were up there? A. I couldn't do it for the cars coming.

"Q. Why didn't you turn the other way on Broad street if you couldn't turn out why didn't you turn in? A. I couldn't turn any other way.

"Q. Why didn't you run on the pavement somewhere where there wasn't any car? A. I couldn't have done that, you see, I was dodging cars coming on West End, I tried to get to them, I was trying to stop, and if anybody coming that way they thought I could stop you know, and I was trying to dodge them, I was getting across there. . . .

"Q. Jim, you say this car you hit down there was parked standing still when you first saw it? A. That I hit?

"Q. Yes. A. Yes, sir.

"Q. You hit it a glancing lick and went around it? A. Yes, sir."

It is seen that the testimony of the driver tends to show that there was no reasonable opportunity for him to cut the truck into the curb without creating a situation more dangerous to the persons and property of others than the course which the driver attempted to pursue.

It was for the jury, and not the judge, to say whether the driver exercised ordinary care under the circumstances, and it was error for the court to suggest that it was the duty of the driver to adopt any specific means or method to stop the truck, and more especially was this true when the tendency of the proof was to show that the method thus suggested could not be safely adopted under the circumstances then existing.

"It is well known to those of us who have had experience in investigating questions of fact before juries, that very slight intimations from the bench have a commanding influence over the jury; and judges presiding at such trials should sedulously avoid an expression of opinion, further than to declare the law."

Ellis v. Spurgin, 1 Heisk., 74, 77.

Subdivisions (c) and (d) of the eighth assignment of error are sustained.

The next criticism of the charge is directed to the following paragraph, viz.:

"But if you shall find that an ordinarily careful driver, situated as the defendant's truck driver was at the time said truck was running backwards and out of control, would or reasonably might have failed to adopt the safest method to prevent the accident, then the defendant would not be liable

if the defendant's truck driver failed to adopt the safest method to have prevented the accident, that is, defendant would not be liable on that ground."

It is said that the word "reasonably" should not have been used where it appears in this instruction, and that "safe" or "safer" should have been used instead of, or in addition to, "safest."

In Moody v. Gulf Refining Co., 142 Tenn., 280, 293, 218 S. W., 817, our Supreme Court quoted with approval from 20 R. C. L., p. 29, as follows:

"One who, in a sudden emergency, acts according to his best judgment, or who, because of want of time in which to form a judgment, omits to act in the most judicious manner, is not chargeable with negligence."

And in Cullom v. Glasgow, 3 Tenn. App. R., 443, 449, this court said:

"It is a well-settled rule, supported by opinions of the courts of last resort in many jurisdictions, that an automobile driver who, by negligence of another and not by his own negligence, is suddenly confronted by an emergency and is compelled to act instantly to avoid a collision or injury, is not guilty of negligence if he makes such a choice as a person of ordinary prudence placed in such a position might make, even though he did not make the wisest choice."

It is seen that a superlative is used in each of the foregoing statements of the "emergency rule," viz.: "most judicious" in one instance, and "wisest" in the other.

When applied to the facts of this case, we think the instruction now under consideration conveyed to the jury the same meaning as it would if the court had substituted "most judicious" or "wisest" for the word "safest."

"Reasonably," where it appears in the paragraph under consideration, was an inapt word, and should not have been used.

The trial court refused to charge a special request relating to the "emergency doctrine" which was tendered on behalf of the defendant, and which was as follows:

"If you find that the driver of defendant's truck found himself in a sudden position of danger to himself or others on the streets caused by some break in the machinery, but then used what appeared to him at the time and under the circumstances the best methods and means to prevent injury to others and in doing so failed to use or adopt the safer or safest method that one in deliberation and not under such danger and circumstances would have adopted, that is, exercised defective or poor judgment, there could be no recovery on this account."

The refusal of the above quoted request is the basis of defendant's tenth assignment of error. There was no error in refusing this re-

quest, "since the instruction, as requested, ignored the thought that if the emergency was produced by the defendant's own negligence it would not relieve him from liability." Cullom v. Glasgow, 3 Tenn. App. R., 443, 450.

The qualification (of the emergency doctrine) just stated was not given to the jury in the court's charge, but defendant is not complaining thereof, and could not successfully predicate error thereon, for obviously such omission could not harm the defendant, but was favorable to him. The tenth assignment of error, and also subdivision (e) of the eighth assignment are overruled.

Subdivision (f) of the eighth assignment challenges, as erroneous, that part of the charge of the court relating to the measure of damages. The charge on this subject is as follows:

"In assessing damages in a case like this you should ascertain from a preponderance of all the evidence the cash market value of the plaintiff's automobile immediately before the accident, and deduct therefrom the cash market value of said automobile immediately after the accident as shown by a preponderance of all the evidence and this difference together with the damages for the loss of the use of plaintiff's automobile during the time reasonably required to make the repairs plus the decreased value of plaintiff's automobile after said repairs were made, if any, as shown by a preponderance of all the evidence, such sum should be the amount of your verdict."

Barring cases where punitive damages are allowable, all rules for the measurement of damages for injuries to automobiles contemplate the ascertainment of just compensation to the injured party for the actual loss sustained; and the rules by which the courts have sought to attain this result are well stated in an opinion by Judge Portrum, speaking for the eastern section of this court in the case of Anderson v. Innman, 3 Tenn. App. R., 195, 196-198, as follows:

"Upon a casual examination of the authorities there seems to be a conflict as to the method used in ascertaining the damage, a great many, if not in fact the majority, following the method of determining the market value of the car immediately before the accident and deducting the market value of the car immediately after the accident, the difference being the amount of damages recoverable. Many others follow the other rule and permit the damages to be ascertained by determining the value of the repairs, plus any depreciation of the car after repairs, and to which is to be added the loss of the use of the car pending the repairs. The fact is also recognized that repairs sometimes enhance the original value of the car at the time of the accident. The plaintiff is not entitled to this, and this item is deducted from the recovery.

"Upon a closer scrutiny of the cases it is found that there is little if any real conflict. The primary inquiry in all cases is to determine the just compensation for the actual loss sustained, which is the basic principle for the measurement of the recovery. And in those cases where the car suffers an injury, which when repaired leaves a depreciation in the market value, the rule of the market value before and after the accident is applied; but in those cases where the injury may be repaired without leaving any permanent or material depreciation, then the rule of the value of the repairs plus the loss of use pending repairs is adopted. These methods under the above circumstances best determine the actual loss sustained. The rule is stated in Huddy on Automobiles (5 Ed.), section 719:

" 'Where, by the wrongful act of the defendant, the plaintiff's automobile is injured, but not totally destroyed, the measure of damages usually adopted is the difference between the market value before the injury and the market value thereafter. In many cases, as a practical proposition, the difference in value may be the cost of repairing the machine. And, as a general proposition, the reasonable value of repairs necessitated is admissible as evidence bearing upon the depreciation in value through the injury. But the cost of repairs may be unsatisfactory as evidence of depreciation in value, for after the repairs the machine may not be of the same value as before the injury, and it is possible that it be of greater value.'

" 'Section 720. The reasonable value of repairs to an injured automobile is frequently considered as the proper measure of damages for the injury. If so, only those repairs which are attributable as resulting from the accident in question are to be considered. In at least one jurisdiction, it seems that the value of the repairs is considered the proper measure of damage when the machine can be repaired, but if not susceptible of repair, the measure is the difference between the value before the accident and afterwards. It is the value, not the cost, of the repairs which is essential; if for some reason the repairs cost an excessive sum, the excess is borne by the owner.'

"Before the advent of the automobile the rule in Tennessee in reference to personal property was, that the damage was measured by the market value immediately prior to the accident or injury, reduced by the value immediately after the accident or injury. Memphis v. Kimbrough, 59 Tenn., 133; Southern Oil Works v. Bickford and Sherrod, 82 Tenn., 651. And the same rule was applicable in measuring the injury to real property. Walton-McDowell Co. v. Jackson, 5 App. Cases, 324. But it is always competent to show the reasonable cost of making repairs as an element or basis from which the market value

may be determined. Lewisburg Ry. Co. v. Minton, 7 App. Cas., 71; Southern Oil Works v. Bickford and Sherrod, supra.

"But where the injury is capable of being repaired, our court has recognized the method of ascertaining the damage by proof of the cost of the value of the repairs, plus the loss of use pending repair. Perkins v. Brown, 132 Tenn., 294."

The undisputed proof in the instant case shows that the plaintiff did not have his car repaired after the accident, but traded it to an automobile dealer as a part payment on a new car, and received for the injured car, in its damaged condition, $1000 as a credit on the purchase-price of a new car valued at $1925. However, it was plaintiff's theory, advanced through his witness Sawyer, that the "trade-in value" of $1000 did not represent the "market cash value" of the damaged car, and that the latter value was about $800. The same witness said the market value of the car immediately before the collision was $1535 (or $200 less than the initial cost to plaintiff two months and eleven days before the accident).

On the other hand, the defendant introduced evidence tending to show that the market value of the plaintiff's car immediately before the accident was approximately from $1160 to $1300—the witnesses stating that the depreciation in value while the car was owned by plaintiff before the accident was from twenty-five percent to thirty percent of its initial cost to plaintiff when new, which was $1735.

Plaintiff also introduced evidence that an estimate of the cost of the repairs which would be necessary to put his damaged car in good condition was $740, but that, when thus repaired, its market value would not be as great as it was immediately before the accident.

Plaintiff testified that he was deprived of the use of a car for twenty days—the time which elapsed between the accident and plaintiff's purchase of a new car—and that the use of his car was worth $10 a day to him.

It was also proven that the Cumberland Motor Company, to whom plaintiff traded his damaged car, expended $152 for repairs thereon and then sold it to a third party at the price of $1152, taking as a part payment on said purchase-price a used Franklin car at a valuation of $150, which Franklin car the Cumberland Motor Company still owned at the time of the trial and had offered it for sale at $75, but had not effected a sale thereof. Some of this latter evidence was admitted over the objection of defendant, and the admission of same is the subject of a separate assignment of error which will be considered later.

We are of the opinion that, upon the facts of this case, the appropriate rule for the measurement of damages was the difference between the market value of plaintiff's car immediately before and immediately after the collision, and that the charge of the court with respect to the measure of damages was erroneous in two par-

ticulars, viz.: (1) In telling the jury that plaintiff was entitled to recover damages for the loss of the use of his automobile "during the time reasonably required to make the repairs," and (2) in telling the jury that, in addition to the difference in the market value of plaintiff's car immediately before and ·immediately after the accident, the plaintiff was entitled to recover the decreased value of his automobile after said repairs were made.

The allowance of the last mentioned item, in addition to the dif-· ference in the market value of the car immediately before and immediately after the accident, was a duplication of damages pro tanto. These are alternative rules, and both cannot be applied at the same time. 42 C. J., p. 1294; sec. 1170; Huddy on Automobiles (7 Ed.), sec. 867.

In Perkins v. Brown, 132 Tenn., 294, 177 S. W., 1158, it was held that the owner of an automobile may recover substantial damages for his loss of use thereof while it was being repaired after a tortious injury by the defendant.

The rule just stated is, of course, subject to the qualification that only a reasonable time for repair will be allowed. Rosenstein v. Bernhard & Turner Automobile Co., 192 Iowa, 405, 180 N. W., 282.

But the rule allowing damages for the use of an injured automobile applies where the damages are computed on the value of the repairs, and not to a case where the proper measure of damages is the difference between the market value before and after the accident. Huddy on Automobiles (7 Ed.), sec. 876; Pugh v. Queal Lumber Co., 193 Iowa, 924, 188 N. W., 1.

There are cases involving the total destruction of commercial vehicles wherein damages for the loss of use are properly allowable; such, for example, as the case of L. & I. Railroad Co. v. Schuester, 183 Ky., 504, 209 S. W., 542, 4 A. L. R., 1344, 1349, wherein the court said: "Here the plaintiff was operating his truck daily as a common carrier over a scheduled route, and, until he could replace it, he had either to rent another or abandon his business; and the rental value of the use of a truck until a new one could be provided was of easy and accurate ascertainment, as was also the value of the truck at the time and place of its destruction. The loss of the use was the approximate and natural result of its destruction, and having been pleaded as special damages, was a proper element of compensatory damages. As stated in Sedgwick on Damages, Vol. 2, (9 Ed.), sec. 436, '. . . where, however, the property was actually in use at the time it was destroyed, the plaintiff may recover compensation for the damage caused by loss of it, up to the time when he could replace it.' "

In the instant case, the plaintiff did not have his damaged car repaired, but elected to buy a new car and sell, or "trade in," his

damaged car, so that, the estimated length of time (two weeks) which would have been required to repair plaintiff's car, if he had elected to have it repaired, is not an element to be considered in measuring his damages.

There is no evidence that plaintiff could not have bought a new car promptly after the accident, upon terms as satisfactory as those obtained twenty days thereafter. The only reason offered by plaintiff for the delay is that he was negotiating with defendant's attorneys for an adjustment and settlement of the damages to his (plaintiff's) car, but, so far as we can perceive, the repair of plaintiff's car, or his purchase of a new car, was not dependent on the success or failure of his negotiations for a settlement of his claim against defendant for damages.

The excerpt from the charge copied in subdivision (f) of the eighth assignment is, in our opinion, erroneous in the particulars we have pointed out, and that assignment (subdivision f) is sustained.

We are of the opinion that, in ascertaining the market value of plaintiff's automobile immediately before the accident, it was competent for the jury to "take into consideration the original cost of plaintiff's automobile when new" and "the amount of use it had been put to," and it was also competent for the jury, in ascertaining the market value of plaintiff's car immediately after the accident, to take into consideration "the estimated cost of making necessary repairs, and also what the injured automobile sold for after the accident without any repairs being made." "These things" were circumstances to which the jury could look, insofar as they tended to show the real market value of the plaintiff's automobile before and after the accident. Subdivision (g) of the eighth assignment of error is therefore overruled.

The defendant's fifth assignment of error is as follows:

"The court erred in submitting to the jury, over the objections of the defendant made at the time, evidence of the plaintiff as a witness, and of the witnesses Hager and Sawyer relative to the amount allowed the defendant for his damaged automobile on a new car, the amount for which the Cumberland Motor Company sold the Fisher car after repairing it, how this purchase money was paid, the valuation placed on another second hand car taken as a part payment, and the fact that the Cumberland Motor Company was unsuccessful in selling this other second hand car at this valuation, and had offered to sell it at $75 without making the sale, all as more fully set out above in the statement of the evidence, and therefore in overruling the fourth ground of the motion for a new trial."

We have already held, in effect, that it was competent to prove "the amount allowed the defendant for his damaged automobile on

a new car,'' and to this extent the fifth assignment, supra, is overruled.

But we are of the opinion that it was not competent to prove, over objection "the amount for which the Cumberland Motor Company sold the Fisher car after repairing it, how this purchase money was paid, the valuation placed on another second-hand car taken as a part payment, and the fact that the Cumberland Motor Company was unsuccessful in selling this other second-hand car at this valuation and had offered to sell it at $75 without making a sale.''

It is conceded on the brief for plaintiff that ''this testimony was remote,'' and we think it was altogether too remote to be competent evidence. The fifth assignment is, therefore, sustained to the extent above indicated.

We have examined defendant's assignments of error numbered four, seven and nine, and find them without merit, and they are overruled without discussion.

This disposes of all the assignments of error except the eleventh, which is that ''the verdict of the jury is excessive, and so excessive as to show prejudice and caprice on the part of the jury.''

As the case must go back for a new trial, it would not be proper for us to express an opinion concerning the amount of the damages.

It results that, for the errors pointed in the assignments we have sustained, the judgment of the Circuit Court is reversed, the verdict of the jury is set aside, and the case will be remanded to the Circuit Court of Davidson County for a new trial.

The costs of the appeal will be adjudged against the plaintiff Fisher and the costs heretofore accrued in the Circuit Court will await the future judgment of that court.

Crownover and DeWitt, JJ., concur.